JACKSON LEWIS LLP
    59 Maiden Lane
    New York, New York 10038-4502
    (212) 545-4000
Attorneys of Record:
    Kevin G. Lauri (KL 8714)
    Peter Moskowitz (PM 8845)

ATTORNEYS FOR DEFENDANT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

MARK DISABATO,

          Plaintiff,

      vs.

PFIZER INC,

          Defendant.

------------------------------------------------------- x

Civil Action No. 05-06040 (BSJ)

**DEFENDANT PFIZER INC'S
LOCAL RULE 56.1 STATEMENT OF
UNDISPUTED MATERIAL FACTS**

        Defendant Pfizer Inc ("Pfizer" or "Defendant") submits this Statement of

Undisputed Material Facts, pursuant to Local Rule 56.1 of the United States District Court

Southern District of New York, in Support of Defendant's Motion for Summary Judgment.

**PFIZER**

        1      Defendant Pfizer is a global pharmaceutical company headquartered in

New York City. (Lauri Aff. ¶2; Ex. E).[1]

---

[1]    References to "Lauri Aff. __" are to the Affidavit of Kevin G. Lauri, Esq., sworn to on June 22, 2006, and submitted herewith. References to "McIntyre Aff. __" are to the Affidavit of Carolyn McIntyre, sworn to on May 25, 2006, and submitted herewith. References to "Ex. __" are to the Exhibits attached to the Lauri Aff.

**B.    Pfizer's EEO Policies**

2.    Pfizer is an equal opportunity employer and it is Pfizer's policy and practice to make all employment decisions without regard to whether an individual is disabled or on the basis of any other statutorily protected status. (See Exs. F-I; Plaintiff dep. 163-64).[2]

3    Pfizer's policies are available to all employees on-line   (Plaintiff dep. 254)

4    Pfizer has a complaint procedure for employees to utilize to report any type of alleged discrimination to the employee's "supervisor, human resources manager, operating unit manager or other level in the organization that may be appropriate." (See Exs. F, H and I).

5    Pfizer also has an "open door policy" that permits any employee to present any concerns, problems or complaints directly to, and ask questions, directly of, senior personnel of the Company." (See Ex. H).

**C.    Pfizer's Short Term Disability Program**

6.    Pfizer administers its short term disability ("STD") program through its Medical Department, also known as Employee Health, which is a separate department within Corporate Human Resources. (Dr. Nody dep. 9)

7.    Pfizer's Medical Department does not provide human resources or business unit employees outside the Medical Department with information relating to the medical reason for employee leaves. (Dr. Nody dep. 13).

---

[2]    References to "Plaintiff dep. __" are to the deposition of Plaintiff attached as Exhibit "A" to the Lauri Aff. References to "Gane dep __", "Berger dep __", and "Dr Nody dep. __" are to the transcripts of the depositions of Emma Gane, Howard Berger, and Dr. Agatha Nody attached as Exhibits "B", "C," and "D" to the Lauri Aff., respectively

2

8.      Pfizer's self-insured STD program provides for sixth months of benefits and covers 100% of the employee's salary for six months   (Ex. J and K)

**D.      Pfizer's Colleague Assistance Program**

9.      Pfizer's Human Resources and Medical Departments do not administer Pfizer's Colleague Assistance Program ("CAP"), which is independently administered by APS Healthcare, Inc. ("APS"), a third party provider.  (Dr. Nody dep. 20-21; Exs. L and M)

10.      Once a Pfizer employee is referred to the CAP, APS is responsible for his treatment  (Dr. Nody dep. 45-46).

11.      If the employee is also out on STD leave, APS only provides Pfizer with updates on the timing of the employee's return to work and finally a certification that the employee has been cleared by APS to return to work.  (Dr. Nody dep. 45-46)

12.      APS evaluates an employee's ability to return to work without any involvement or input from Pfizer.  (Dr. Nody dep. 45-46).

13      APS does not provide Pfizer with any medical information concerning employees in the CAP; the only interaction between Pfizer's Medical Department and APS occurs when there is a mandatory referral of an employee to the CAP by Pfizer's Medical Department.  (Dr. Nody dep. 22, 24)

**E.      Pfizer's Policies Regarding Employee Requests For Accommodations**

14.      Pursuant to Pfizer's policies, all requests for accommodations arising from an employee's disability are submitted to Pfizer's Medical Department for review.  (Gane dep 82).

15.      Employees obtain the form to submit a request to Pfizer's Medical Department for an accommodation from HR Source, a third party provider Pfizer contracts with

3

to provide its employees with, *inter alia*, human resources forms and services   (Gane dep. 37-41; Dr. Nody dep. 9-10).

      16.    Once an employee contacts Pfizer's Medical Department and requests an accommodation, Pfizer's Medical Department sends the employee a form letter enclosing a medical records authorization and reasonable accommodation request form to be completed by his doctor.  (Dr. Nody dep. 61-62; Ex. N).

      17.    Upon receipt of completed forms from an employee's doctor requesting an accommodation, Pfizer's Medical Department reviews the request  (Dr. Nody dep. 9-10).

      18.    If the Medical Department determines that the employee requires an accommodation, the Medical Department notifies Human Resources to determine whether the business can accommodate the employee's medical restriction.  (Dr. Nody dep. 10, 14).

**PLAINTIFF'S EMPLOYMENT AT PFIZER**

**A.**    **Plaintiff's Hire**

      19.    Plaintiff was hired by Pfizer as a Senior Manger in its Business Technology Unit ("BTU") in June 2000.  (Plaintiff dep. 41, 45).

      20.    The BTU provides technical support to Pfizer's Finance Department. (Plaintiff dep. 44).

      21.    As of September 2000, Plaintiff was one of five Senior Managers who reported to Joseph Schmadel, the then Director of Plaintiff's group within the BTU   (Plaintiff dep. 46-47).

      22.    The other four Senior Mangers had worked for Mr. Schmadel at Warner Lambert prior to its merger with Pfizer.  Plaintiff was the only direct report to Mr. Schmadel who Mr. Schmadel had not hired.  (Plaintiff dep. 90)

4

**B.**     **Plaintiff's Unsatisfactory Job Performance**

23.     From the beginning, Mr. Schmadel was not satisfied with Plaintiff's performance as a Senior Manager. (Plaintiff dep. 102-03, 113)

24.     Despite repeated oral counseling from Mr. Schmadel, Plaintiff did not improve his job performance. (Gane dep. 65; Plaintiff dep. 82-83, 90-91)

25.     As the BTU group grew, in early 2002, Mr. Schmadel was promoted to Senior Director/Group Leader and two Senior Managers in the group, Paul Hurring and Paul DeBartolo, were promoted to Director positions within the BTU. (Plaintiff dep. 60-62).

26.     Mr. Schmadel in turn assigned Mr. Hurring to supervise Plaintiff (Plaintiff dep. 53-54).

27.     When Plaintiff's performance did not improve under Mr. Huring's supervision, Mr. Schmadel assigned Mr. DeBartolo to supervise him. (Plaintiff dep. 100-101).

28.     Because Plaintiff continued not to perform his job duties and responsibilities at a Senior Manager level (Plaintiff dep. 104), in the fall of 2003, Mr. Schmadel assigned Howard Berger, a new Director in the group, to directly supervise Plaintiff. (Plaintiff dep. 59-60).

29.     Mr. Berger supervised Plaintiff from the fall of 2003 through September 2004. (Plaintiff dep. 46-47; Berger dep. 10).

30.     Plaintiff's supervisors were not successful in obtaining sustained improvement in his job performance. (Gane dep. 149).

5

31.    Throughout his employment he was unable to timely complete projects and he poorly communicated and interacted with the Pfizer Finance Department.  (Gane dep 140-43, 146, 149; Plaintiff dep  226).

32.    As a result of Plaintiff's unsatisfactory performance he was consistently rated as performing below expectations.  (Ex. O).

33.    Plaintiff's performance ratings resulted in him receiving below average salary increases throughout his employment  (Plaintiff dep. 82-83; Ex. O).

**C.    Plaintiff's Job Searches Within Pfizer**

34.    From the onset of his employment, Plaintiff recognized he was not succeeding in his position as a Senior Manager in the BTU.  (Plaintiff dep. 107-09, 112-13, 137, 170).

35    Plaintiff commenced looking for another position within Pfizer in the Summer of 2001  (Plaintiff dep. 107-09, 112-13, 137, 143-44, 146, 170).

36.    Plaintiff applied for various positions at Pfizer by submitting his resume through Pfizer's intranet job posting system.  (Plaintiff dep. 227).

**D.    Plaintiff's Relationship With Mr. Schmadel**

37    Plaintiff did not like Mr. Schmadel's management style, which Plaintiff perceived as demanding, not giving clear direction, and not giving positive feedback.  (Plaintiff dep. 103, 127, 211-212, 216)

38.    Plaintiff, however, admits that Mr. Schmadel never made a negative comment about his mental health.  (Plaintiff dep. 111).

39    Plaintiff also admits that Mr. Schmadel accommodated his request to leave early once a week to attend therapy.  (Plaintiff dep. 99).

6

40.     After Mr. Schmadel stopped directly supervising Plaintiff in early 2002, they had very little daily interaction with each other.  (Plaintiff dep. 56-57).

41.     Indeed, Plaintiff's and Mr. Schmadel's offices were located in different buildings and their interaction was weekly not daily.  (Plaintiff dep. 66, 176-77)

42.     After the summer of 2003, Plaintiff's only interaction with Mr. Schmadel was an occasional meeting on the security project Mr. Schmadel continued to oversee.  (Plaintiff dep. 66, 176-77).

**E.     The Deterioration In Plaintiff's Performance In The Spring Of 2004**

43.     Mr. Berger was a good manager who took an interest in supervising him and provided Plaintiff with clear direction and feedback.  (Plaintiff dep. 225-26, 228).

44.     Notwithstanding Mr. Berger's efforts, after a slight improvement in Plaintiff's performance under Mr. Berger's supervision in late 2003 and early 2004, Plaintiff's performance rapidly declined in the Spring of 2004.  (Plaintiff dep. 186, 190).

45.     By April 2004, Plaintiff admits he was unable to perform his job as a Senior Manager in the BTU due to his depression and ADHD.  (Plaintiff dep. 167, 190).

**PLAINTIFF'S MANDATORY REFERRAL TO THE CAP**

46.     On Friday, May 8, 2004, Plaintiff initiated a meeting with his human resources representative, Emma Gane.  (Plaintiff dep. 116; Gane dep. 16).

47.     Plaintiff informed Ms. Gane that he was considering taking a leave of absence.  Ms Gane explained to Plaintiff that if he was going to do so, he would need to obtain the necessary forms from HR Source and she provided him with HR Source's website.  (Plaintiff dep. 116-17, 124; Gane dep. 83).

48.   On Monday, May 11, 2004, Plaintiff asked Dominic DiGiorgio, a Director in Plaintiff's group and a friend, to accompany him out of the office to get coffee at Starbucks (Plaintiff dep. 117).

49.   While discussing with Mr. DiGiorgio the possibility of requesting a leave of absence, Plaintiff commented to him "I haven't come in and shot any one yet." (Plaintiff dep. 118; Exs. P, Q. and R).

50.   Mr. DiGiorgio informed Mr. Berger of Plaintiff's comment and Mr. Berger, who had previously discussed Plaintiff's deteriorating performance with Ms. Gane, reported Plaintiff's comment to Human Resources  (Plaintiff dep. 118; Exs. P, Q and R).

51.   Messrs. DiGiorgio and Berger acted appropriately in reporting Plaintiff's comment to Human Resources.  (Plaintiff dep. 205).

52.   Because Ms. Gane was out of the office the morning of May 11, 2004, Mr. Berger spoke to her supervisor, Darryl Albertson.  (Gane dep. 17; Exs. P and R).

53.   Mr. Albertson contacted Ms. Gane at home and, due to the issue of potential work place violence raised by Plaintiff's comment, she immediately contacted Dr. Nody in Pfizer's Medical Department.  (Gane dep. 88-89; Exs. P and Q)

54.   Ms. Gane also spoke to Mr. Berger and Mr. DiGiorgio about the incident. (Gane dep. 89-92; Exs. P, Q and R).

55.   Upon arriving at Pfizer's offices, Ms. Gane met with Dr. Nody  (Gane dep. 96)

56.     Dr. Nody told Ms. Gane that they needed to bring Plaintiff in for a mandatory referral to the CAP.  (Gane dep. 92-93).

57      Mr. Gane called Plaintiff down to her office and she and Dr. Nody met with him.  (Gane dep. 98-99; Dr. Nody dep. 25; Plaintiff dep. 119).

58.     Dr. Nody advised Plaintiff of what had been alleged and, as a result of Plaintiff's threatening comment, Dr. Nody explained the mandatory referral process to him.  (Dr. Nody dep. 27, 29, 99-101, 119, 152-53).

59      Dr. Nody explained to Plaintiff that the CAP would be the entity to clear him to return to work and she presented him with and Plaintiff signed a mandatory referral to the CAP.  (Dr. Nody dep. 27, 29; Gane dep. 99-101; Ex. S).

### PLAINTIFF'S FIRST SHORT TERM DISABILITY LEAVE

60      At the conclusion of their May 11, 2004 meeting, Dr. Nody put Plaintiff in touch with Carolyn McIntyre, APS' Pfizer On-Site Counselor.  (Dr. Nody dep. 23)

61      APS referred Plaintiff to Dr. Mitchell Newmark for an independent medical evaluation ("IME").  (Plaintiff dep. 120)

62      On May 13, 2004, Dr. Newmark examined Plaintiff and diagnosed him with major depression and ADHD.  (Ex. T; Plaintiff dep. 120).

63      Dr. Newmak issued a five page single spaced report to APS.  Dr. Newmark's report concluded with eight opinions including that "When Mr. DiSabato returns to work at Pfizer, I strongly recommend that he no longer work for his present boss.  He should report to someone who is straight forward, willing to give explicit advice, and understanding of Mr DiSabato's strengths and weaknesses."  (Ex. T).

9

64.     In error, and contrary to APS' polices and procedures, on June 10, 2004, APS faxed Dr. Newmark's report to Dr. Nody in Pfizer's Medical Department without explanation. (Dr. Nody dep. 39-40, 46-47; Ex. U)

65.     Because Plaintiff was on STD leave at the time and had not yet been cleared by APS to return to work, Dr. Nody filed Dr. Newmark's report and took no further action. (Dr. Nody dep. 42; Gane dep. 182-83)

66.     Dr. Nody testified at her deposition that this was the first time she had ever received an IME report from APS. Dr. Nody explained:

> I didn't do anything with it because the employee was on disability
> and we were waiting for his return to work and his physician
> would be the one that would be returning him to work and giving
> us recommendations requiring any kind of work restrictions or
> accommodations.

(Dr. Nody dep. 42)

67.     In or about early June 2004, Plaintiff submitted his application for STD, retroactive to May 11, 2004, on the basis of his being unable to work due to depression and ADHD. (Ex. V).

68.     Plaintiff's application for STD was approved by Pfizer's Medical Department on June 14, 2004, retroactive to May 11, 2004. (Ex. W).

69.     On May 21, 2004, Ms. Gane left a message for Plaintiff to call her concerning his interacting with Pfizer employees while he was on leave. (Gane dep. 134; Plaintiff dep. 121).

70.     During the conversation Plaintiff told Ms. Gane that he was doing well and that Dr. Newmark had recommended that when he returned to work, he not return to the same supervisor because it was not a healthy place to be. (Gane dep. 119-20; Plaintiff dep. 121).

71.     In accordance with Pfizer policy, Ms. Gane explained to Plaintiff that she does not deal with medical issues and that his medical team should contact Pfizer's Medical Department. (Gane dep. 121; Ex. X)

72.     Ms. Gane also told Plaintiff that if Pfizer's Medical Department was unable to help him he should call her and she would look into what he should do. (Gane dep. 126; Ex. X).

73.     Plaintiff thanked Ms. Gane for her help. (Gane dep. 130; Ex. X).

74.     Ms. Gane took contemporaneous notes of her May 21, 2004 telephone conversation with Plaintiff. (Ex. X).

75.     Ms. Gane did not follow-up with Pfizer's Medical Department because if she had, she knew they would have told her Plaintiff needed to contact them directly and she had already told Plaintiff to do so. (Gane dep. 131).

76.     Despite being advised to have his medical team contact Pfizer's Medical Department concerning his desire to change his supervisor, Plaintiff never did so. (Plaintiff dep. 136).

77.     He did not submit the requisite form to Pfizer's Medical Department and never subsequently raised the issue with Ms. Gane. (Plaintiff dep. 136).

11

78.    Between May 11, 2004 and August 10, 2004, Plaintiff met with Ms. McIntyre seven times and had five telephone conversations with her concerning his mandatory referral, prospective return to work, and return to work   (McIntyre Aff. ¶4).

79    Plaintiff neither requested that Ms. McIntyre assist him in obtaining an accommodation from Pfizer in order to return to work nor did he tell her that he had requested an accommodation from Pfizer. (Plaintiff dep. 187; McIntyre Aff. ¶¶ 5-6).

## PLAINTIFF'S RETURN TO WORK ON JULY 1, 2004

80.    On June 30, 2004, APS certified Plaintiff as able to return to work on July 1, 2004.  (Ex. Y).

81.    Prior to returning to work on June 29, 2004, Plaintiff sent Ms. Gane an e-mail stating "I am currently supposed to return to work this Thursday, according to all on this end.  Is there anything that you/we need to do for me to return?  Please let me know so that we can address it if it is an issue.  Thanks." (Ex. Z; Plaintiff dep. 122).

82.    Plaintiff testified at his deposition that he specifically did not ask in his e-mail whether he was returning to the same position or request a change in supervisors   (Plaintiff dep. 126).

83.    Upon receipt of Plaintiff's e-mail, Ms. Gane contacted Dr. Nody to find out if Plaintiff had submitted a medical request to transfer positions.  Dr. Nody told Ms. Gane that Plaintiff had not done so.  (Gane dep. 158-59, 182).

84.    When Plaintiff returned from his first STD leave on July 1, 2004, he returned to the same Senior Manager position in the BTU with the same salary and benefits he was in when he went on leave on May 11, 2004.  (Plaintiff dep. 68-69, 122)

85.   Ms. Gane asked Plaintiff if he had followed-up with Pfizer's Medical Department as she had suggested he do. (Gane dep. 131).

86.   Ms. Gane testified she told Plaintiff "you'd mentioned on the phone that there was going to be this request. Nothing seems to have come in and you're back. Is everything okay?" Plaintiff replied to Ms. Gane that "Yeah, everything's fine." (Gane dep. 132-33, 131).

87.   After he returned to work on July 1, 2004, Plaintiff continued to report directly to Mr. Berger and he had very little, if any, direct contact with Mr. Schmadel. (Plaintiff dep. 128).

88.   Plaintiff testified at his deposition that he did not have any problems with Mr. Berger as a supervisor. (Plaintiff dep. 127).

89.   In the Summer of 2004, Pfizer's Global Pharmaceutical Division (which included the BTU) required that all underperforming employees with performance ratings of less than 3.0 be placed on formal performance improvement plans ("PIP"). (Berger dep. 23-24).

90.   Plaintiff was one of two underperforming professional employees in his group with a performance rating less than 3.0. (Ex. O).

91.   Accordingly, in mid-August 2004, Mr. Berger informed Plaintiff that he was going to be placed on a PIP after the upcoming Labor Day weekend. (Berger dep. 25; Gane dep. 172-73; Plaintiff dep. 130-31).

92.     Mr. Berger also explained to Plaintiff that he could opt to take a severance package prior to being placed on PIP. (Gane dep. 173)

93.     After his return to work on July 1, 2004, Plaintiff did not inform Ms Gane, Mr. Berger or Pfizer's Medical Department that things were not working out for him in the group and that he needed to transfer to another position. (Plaintiff dep. 149, 197-98; Gane dep. 169, 171; Berger dep. 28-29).

94.     Plaintiff admits that at no time during his employment at Pfizer did he ever request an accommodation from Pfizer's Medical Department. (Plaintiff dep. 136).

### PLAINTIFF'S SECOND SHORT TERM DISABILITY LEAVE

95.     September 3, 2004, the Friday before Labor Day weekend, was the last day Plaintiff worked at Pfizer. (Plaintiff dep. 8-9).

96.     On Tuesday, September 7, 2004, before he was scheduled to receive his PIP, Plaintiff requested and was granted a second STD leave. (Plaintiff dep. 16-17; Gane dep. 172-74; Exs. AA and BB).

97.     During his second STD leave, Plaintiff never advised anyone at Pfizer that he was interested in returning to work, was able to return to work or needed an accommodation in order to return to work. (Plaintiff dep. 136, 197-98, 201, 231-32).

98.     Plaintiff remained on STD leave until January 18, 2005. Plaintiff received his full salary and benefits from Pfizer while he was on STD. (Plaintiff dep. 16-17; Ex. CC).

99.     Plaintiff testified unequivocally at his deposition that he was not capable of working from the date his second STD leave commenced on September 7, 2004 through at least September 2005. (Plaintiff dep. 24-25, 131, 172-73).

14

## PLAINTIFF'S APPLICATION FOR AND RECEIPT OF
## LONG TERM DISABILITY BENEFITS

100. On February 11, 2005, Plaintiff applied for long term disability ("LTD") benefits on the basis that he was unable to work. (Plaintiff dep 271; Ex. DD)

101. Pfizer's LTD program is administered by CIGNA Group Insurance ("CIGNA"). (Dr. Nody dep 10-12) Pfizer's involvement in the LTD program is limited to receiving information from CIGNA as to the status of employee applications and/or benefits. (Dr. Nody dep. 10-13).

102. On April 20, 2005, CIGNA initially denied Plaintiff's application for LTD benefits. (Ex EE).

103. On July 26, 2005, Plaintiff appealed CIGNA's denial of LTD benefits on the basis that he had been and continued to be unable to work. (Plaintiff dep. 17-19, 32, 275, 278-79).

104. On October 11, 2005, CIGNA granted Plaintiff's application for LTD benefits through May 18, 2005. (Ex. FF)

105 Plaintiff appealed CIGNA's denial of LTD benefits after May 18, 2005 on the basis that he has continued to be unable to work from May 18, 2005 to the present. (Plaintiff dep. 18-19, 275, 279).

106. On June 20, 2006, CINA approved Plaintiff's claim for LTD benefits on the basis that Plaintiff remains unable to work. (Ex. GG).

## PLAINTIFF'S APPLICATION FOR AND RECEIPT OF SSI DISABILITY BENEFITS

107 In the end of August 2004, Plaintiff applied to the United States Social Security Administration for social security disability benefits on the basis that he was totally

disabled and unable to work due to severe depression and ADHD.  (Plaintiff dep. 11-12, 269-70;
Ex. HH)

        108.    On August 27, 2005 Plaintiff was granted social security disability
benefits as of March 2, 2005 and continues to receive SSI disability benefits.  (Plaintiff dep. 11,
15-16, 205; Ex. II).  Plaintiff is currently unable to work.  (Plaintiff dep. 20; Ex. GG)


        Respectfully submitted,

        JACKSON LLP
          59 Maiden Lane
          New York, New York 10038-4502
          (212) 345-4000

Dated: June 22, 2006        By: _____
     New York, New York          Kevin G. Lauri (KL 8714)
          Peter C. Moskowitz (PM 8845)

        ATTORNEYS FOR DEFENDANT

H:\MoskowitzP\Pfizer\Disabato\legal\SJ Brief\Rule 56 1 doc